We're happy to hear from Mr. Tochen and Cortel v. Verizon. Good morning, Your Honor. We're here on a second appeal. The court heard the first appeal. I'm sure it remembers what happened there. And what we're here to do is to discuss with you what we believe you meant by your remand order and what the district court did below when it got the case back. I'm going to try to address five different things. I'm going to try to address the mandate rule, what we call the mandate rule. I'm going to address the late payment charge issue. I'm going to address three financial issues. One is the charges by Verizon South, which totaled $65,000. The charges for what we call the serving wire center concept, a tariff concept that was applied here, which was a $35,000 concept. And lastly, a $55,000 concept for what we call the shared facilities problem with the evidence that was presented below. Now, the mandate rule, in my mind, is pretty simple. It means that once a mandate is issued and something is remanded back to the district court, the district court can't allow the litigant to raise issues that it didn't raise previously or that it could have raised but didn't or raised but were decided. Basically, you get the record back and you do what this court said to do, which you said to enter a damages order consistent with this opinion. And consistent with the opinion that the court previously issued, the damages order should have been a net $150,000 damages order in favor of Cortel because that's all that was left in the case. When Verizon brought this case, brought its counterclaim, it raised only a single issue. Could it charge Cortel tariff rates for its facilities charges? That was what it sued for. That is what it litigated. That is what it took up on appeal. And that is what it lost. When it got back to the district court, however, the district court essentially and effectively allowed Verizon to amend its complaint to raise an issue which it could have but didn't raise on the first appeal. Didn't Verizon also seek damages associated with your breach of the interconnection agreement? They did, but their damages theory and the only one they put forward was a claim that they could sue us under the tariff for those damages. They never said, in fact, they explicitly said we have a right to sue under the tariff. They never said we have a right to sue under TELRIC. Except we said that instead of using TELRIC they should have used TELRIC and the district court went back and recalculated under TELRIC rates. Right. Well, effectively what the district court did is it allowed them to remake their entire claim. Well, they would have to because we told them to do so. We told them the tariffs were not appropriate, the TELRIC rates were, and they had to recompute it all under the TELRIC rates. You didn't want the services for free, did you, under our mandate? We wanted to be billed for TELRIC, but we never were billed for TELRIC. I understand. That was their error. We found that to be erroneous. We said they were billed under tariff rates, which were higher, and we sent it back to have the district court run it through TELRIC. I don't quite understand this whole issue. I must say I read your briefs and I thought it was hyper-technical because it was pretty clear our opinion said we're remanding to compute the damages under TELRIC rate. It's more than hyper-technical because if it were a remand to simply recalculate, we wouldn't have had to have a new trial. We would have had all the evidence, and you just say $10, $3 difference, $7. But that's not what happened. There was a substantial reduction as a result of the first opinion, and it's not as if you didn't receive the benefit of the first appeal. I mean, the damages were reduced to, what was it, $216,000? The damages were reduced, but they weren't reduced to TELRIC. What were they beforehand? $1.3 million, I believe. So you had a gigantic reduction in the damages as a result of the first appeal. There's no question. The damages decreased, but the damages didn't decrease to TELRIC. I don't understand that argument. I mean, you're articulating it in a way that I did not entirely understand from your brief. What do you mean they didn't reduce it to TELRIC? Well, if it were a TELRIC calculation, what you would have done is you would have taken an element that was already in the record, and you would have said $10. What do you mean? Are you talking about? District Court or Verizon. District Court, Verizon, Quartel. What Quartel actually did is it took the element that was already in the record, and it said the TELRIC charge for that element was $3. We had 100 of those elements. That's $300. What Verizon did is that they changed the record below. They said that our record was incorrect. We have mistakes in the record. So let's retry the whole thing. Well, okay, but I saw that. Are you talking about the Great Bridge multiplexer? Well, there were several of them. There were several instances. But is that the kind of thing you're referring to? That's one. Another mistake, another great mistake, was there were almost 100. There were 96 instances where they charged only a percentage of use. And then on remand, they said, in fact, on remand on rebuttal evidence, they said, oh, that was just a typo, a mistake. We really meant to charge. But there were errors, apparently. The Great Bridge multiplexer, for example, what is located in Verizon South's territory? Is it not? No. No. Actually, it's not. They argue that it is. Well, the court found as a fact, so you have to show that that was clearly erroneous. Okay. So the issue is where is Great Bridge? Great Bridge is clearly Verizon South, but that's only one issue. The second issue is on what side of the doorway was that multiplexer? If the multiplexer was on that side of the doorway, it's in Verizon South. If it's on this side of the doorway, it's in Verizon Virginia. And we know from the record it was on this side of the doorway until we got it back, remanded, and suddenly it moved to the other side of the doorway. So I'm now understanding your mandate argument a little differently. You say you're articulating mandate as subsuming the errors. What you contend were the errors that Verizon corrected on retrial, the multiplexer being one such error. What I'm saying is that when you go- Because they did bill you. I mean, you are now. The district court did line up facilities to see to it that you were billed at the appropriate level. We believe it didn't, but- I think my understanding of the argument you were making about the mandate rule is that you did not have to pay under TELRIC either as opposed to the tariff rate because you weren't billed because Verizon had never billed you at tariff. And now the argument seems to be changing. I think that you are correct. I think that the mandate rule in its pure form means exactly that, that they cannot go back and basically amend their complaint to say now you owe us under TELRIC. I think that's what the mandate rule says. Now, it creates a problem. It creates a problem in that, as Judge Niemeyer said, do we get these facilities for free? At the very least, it must mean that you can't go back and reinvent the entire pieces of all the evidence that you have. So you're now not arguing that they can't bill you at TELRIC, that you do not owe them rates under TELRIC? We are arguing both. We think the mandate in this court said go back and recalculate. But at the very least, the mandate of this court said go back and don't retry the case and make up new evidence and create a new counterclaim, which is what they did. But you are stuck at the very least, you are stuck with the evidence that you had initially. You can't make new evidence and new claims that weren't in the case before. So suppose there was a typographical error. That means it could not be corrected, even if it is demonstrably erroneous? And the district court finds that it's demonstrably erroneous? They went to trial initially that way. They took it up on appeal that way. The accident of remand can't allow them to go back and make a correction that is a $50,000 or $100,000 correction in their favor. Assuming that it is a correction. We don't say it is. We think that it's just made up. But assuming it's a correction, you can't go back on remand and use the accident of remand. That's what this court has said in Pelleggio. You can't use the accident of remand to remake your claim. No more so than when you held that they had the right to get our facilities for free. On remand, we could have gone back and said, well, we have an equitable claim. We have a claim that we could have made a restitutionary claim. We never made it previously. But on remand, why couldn't we do that and say you can't get our facilities for free because we had a $1.7 million charge to them? Why couldn't we remake that on remand? We couldn't and they can't. That's our point with respect to the mandate rule. With respect to the Verizon South charges, we think that the mandate of this court was absolutely clear that it is only the company that provides the entrance facilities that can charge for the facilities charges at issue in this case. Verizon South, it is beyond dispute Verizon South provided no entrance facilities. All those entrance facilities were ordered from Verizon Virginia. Verizon Virginia took our orders and transported everything to Verizon South. The deal that Verizon South or Verizon Virginia had is irrelevant to us. But Verizon South cannot charge us for an entrance facility and they can't charge us for any of the facilities charges associated with an entrance facility. That's exactly what this court said when Cortel's claim for $1.7 million was struck down. You said if we don't provide the entrance facility, you can't provide facilities charges because the only thing the ICA allows is a facilities charge that's connected to an entrance facility. In fact, today, as a result of the first district court opinion where we were hit with a $1.3 million tariff charge, my client went out and they started doing business in a completely different way. If the mandate only applied to entrance facilities and not to transportation services, transport services, then it seems to me that the tariff rate for the transport facilities would stand and only the entrance would go back at Telric. No, what the court held initially was that under the ICA, you can only charge for any facilities charge if it's connected to the provision of an entrance facility. That's what the court interpreted. That's why the court said we, Cortel, cannot charge $1.7 million because we didn't provide the entrance facility. Verizon South also doesn't provide an entrance facility. Again, today what we do is we order the same facilities from Level 3. Level 3 takes our calls and brings them to Verizon. We don't get charged by Verizon. We get charged by Level 3 because Level 3 is providing the entrance facility. It's the same thing. Verizon Virginia is providing the entrance facility. It brings our calls to Verizon South. Verizon South has no way to charge. There might be an intercharge, an interstitial charge, an intercompany charge between Verizon South and Verizon Virginia, but it can't be a charge to us because that's what this court has said. Thank you, sir. You have some rebuttal time. Okay, so I'll reserve for rebuttal. Yes. Mr. Angstreich. Thank you, Your Honors. To begin, this court remanded for, and I'm quoting, consideration of Verizon's damages claim. Verizon's damages claim was pled, and this is a joint appendix 76 to 77, as a breach of interconnection agreement claim, and we specifically alleged that we had billed them under the party's interconnection agreements because we thought, I think rightly, but the court disagreed, that we were allowed under those contracts to apply our tariff rates. On remand, we took the same evidence that was underlying our damages case before. We never had a trial on a damages case before. After the judge ruled on liability, the party stipulated to the damages amount, but our evidence has never changed. Our evidence was always the underlying contemporaneously issued bills to court's help. As the district court found, as a matter of fact, those bills identify with precision the facility. The legal claims that you raised from the evidence changed? No, it was always a breach of contract claim. The only thing that changed was that we applied the telework rates from the contracts to the elements that were ordered and provided and billed, rather than, as we had at the time, the tariff elements, the tariff rates. And so that's what the trial was about, was how do you take those telework rates from the contracts and apply them to the elements. You sought declaratory relief, and then we sent it back for calculations of damages arising out of your claims regarding the breach of the interconnection agreement. That's exactly right, Judge. We had two claims, one for a declaratory ruling, because we projected this would continue in the future, and one for damages that was pled as a breach of interconnection agreement claim. The only thing that changed on remand were the rates. But you did find some errors. Well, so let me be clear about that, because there were two different kinds of errors. One, the underlying evidence was the invoices. We had at summary judgment included a, what we thought at the time was a complete summary of the invoices. It turned out it wasn't. There were just facilities that were actually on the invoices that didn't make it into the summary that we had used at summary judgment. Now, the judge below Judge Hilton never ruled on that evidence because he didn't rule on damages at summary judgment, and we stipulated. On remand, we went back and looked back at our underlying invoices, and we created a more complete summary. And at trial I asked Cortell's sole witness, is there any line on our summary that is not found in the contemporaneous invoices? And he said he couldn't find one. So that's the summary we went to trial at, and Cortell had an opportunity to claim it because we had a different summary before the judge had disregarded it, and Judge Hilton concluded that our summary was in fact an accurate summary of the underlying evidence, which was undisputed. Let's be clear about this too. Cortell cross-designated as exhibits our invoices, our invoice exhibits. So the underlying documents, and these were 16 or so really large binders of evidence, was undisputed. So now we have the summary. Now we get Judge Duncan to the couple of errors. Yes, for a few months Verizon contemporaneously billed that Great Bridge multiplexer as though it were being provided by Verizon Virginia, and about 11 months in it was corrected on the bills at the time, not at trial. And so when we went and applied the tower grades, it actually benefits them because for the 11 months that Verizon was incorrectly identifying that multiplexer... They get the benefit of the lower... Of the lower rate, exactly. The lower variety, yeah. I think we could have corrected it. If we corrected it, we actually would have gone back and changed the associated company and asked for more money. We didn't do that. Although, in fairness, it was your mistake. Exactly, and we didn't try to correct it. Now, with regard to the shared facilities issue, let's be clear. The evidence at trial showed, and Judge Hilton found, that Cortell got, ordered and got, 100% of the facility. It wasn't sharing it with anyone. And the tariff explains that shared use is sharing between two different services by the same company. And so, yes, on the tariff bill, we had underbilled them. For some reason that I can't figure out, part of the apportionment didn't happen on the bill. But there's no need to do that apportionment in the TELRIC rate world because there aren't separate TELRIC rates depending on how you use an entrance facility for special access or switched access. So, because they got the entire facility, we applied the TELRIC rate to the entire facility. And I don't see that as a correction of an error other than billing them for what it is they actually ordered and the evidence showed that they got. Could I ask a question about the late payment? Sure. Which I'm a little unclear about. So, as I understand it, when Cortell appealed the first time, instead of posting a bond, it was agreed that Verizon got to withhold future reciprocal compensation payments, which would be credited depending on how things turned out. Right, yes, we could withhold it and apply it to the judgment. Yes, that's exactly right. Okay, is there anything that specifies how it gets applied? In other words, in whose discretion is it applied to the principal as opposed to the late payment fee? You see what I'm saying? I see what you're saying, Your Honor. The way that the agreed-upon stay terms were written is that it was to be applied to the judgment, and the judgment was everything. It's everything. So, you would not, I mean, there's nothing that requires you to apply it to reduce the principal first. I mean, you could, it would be within, so you're saying, as you understand it, it would be within your discretion to apply it to the late payment fee so that the principal isn't reduced on which the late payment fee continues to be accrued. Right, and to be clear, the late payment fee stopped accruing when the judgment issued. At that point, we got the incredibly low statutory post-judgment interest. So, once the judgment issued, we had a lump sum, the money for our damages claim, the money for our special access claim, less the $250,000 owed to Cortel, and we've always said that that 90-some-odd thousand gets applied to reduce the judgment. So, that, I think, takes care of late payment charges. Mr. Tolchin talked a bit about Verizon South. This court did not hold in rejecting Cortel's claim for facilities that only the party that provides the entrance facilities can charge. This court held that the trunk ports and multiplexes Cortel provided lay within Cortel's central office. They were on its side of the interconnection point. The Verizon facilities were on Cortel's side of the interconnection point, and you see that if you look at the contracts. The contracts distinguish between the point of interconnection, which is defined in section 1.54, and the interconnection point, which is defined in section 1.37. I recognize that Verizon probably could have used slightly different terms to describe the two different things, given how close point of interconnection and interconnection point are, but they are distinct concepts in the contract, and section 4.2.2 says that the interconnection point, when Cortel is delivering calls to Verizon, the interconnection point is the piece of telephone company equipment that serves the Verizon customer answering the call, and it was established at trial that Cortel had three of those interconnection points in Verizon South's territory, and Cortel, therefore, under section 4.2.2 of the contract, had the obligation, was responsible for delivering its terminating traffic to those Verizon interconnection points so that Verizon's customers could answer the phone, and when Cortel's transport that it got was in Verizon South's territory, we applied the Verizon South contract rates because the contracts are both clear on the front of them. The Verizon Virginia contract applies only in Verizon Virginia's service territory. It doesn't just say that. It says that Cortel Virginia represents and warrants that those terms apply only in Verizon Virginia's territory, and Cortel Virginia represented and warranted that the Verizon South rates applied only in the Verizon South territory, and we did not, as Mr. Tolchin suggested, apply Verizon South rates to everything. We applied Verizon South rates to the facilities in Verizon South's territories, and if you look at the diagram that was used at trial on page 20 of our brief, it shows that the only Verizon South rate we applied when Cortel managed to connect its switch enrichment over to Emporia so that it could deliver calls to Verizon customers in Emporia, Virginia was the mileage, 33.6 miles of transport that was actually in Verizon South's territory. Everything else was billed at the Verizon Virginia rates because it was in Verizon Virginia's territory. Cortel simply had no authority to get Telerik-priced facilities in Verizon South's territory other than through the interconnection agreement. I'm happy to talk about anything the court would like or has questions about. Mr. Tolchin did identify two other issues that he planned to talk about. I'm happy to address them briefly if necessary. The fact that we don't touch on something in oral argument doesn't mean the issue is waived at all. We still have your brief, and it's preserved there. Okay, well, the court has no further questions. I'll proceed to the remainder of my time. Thank you. Mr. Tolchin, you reserve rebuttal time. Yes, sir. So as I'm listening to the argument, I'm thinking to myself, but those invoices didn't have 100% usage. They had to have been changed. What they did is they went back, and they said the invoices were wrong. It's not that the invoices were correct. The invoices were wrong. They changed the invoices to juice them up to be 100%, and that cost $55,000 more to Cortel. Now, if you want to start with the invoices, which is what Mr. Angstreich said, then the damages are $55,000 less. The second issue is we all know TELRIC is less, right? TELRIC is a smaller number than the tariff charges, but our Verizon South charges rose from $5,000 pre-remand to $65,000 post-remand. How did that happen? It happened because, unlike what Mr. Angstreich listed... But would have those charges been included in Virginia, Verizon Virginia? No, because what happens is that Verizon South has different numbers than Verizon Virginia, and Verizon South's numbers are both higher and a per-mile number as opposed to Verizon Virginia, which are lower and a flat number. So if you look at page 20 of their brief, where they have their nice little thing there, the nice little diagram, what they've done is, if you look here, Verizon South's... On page 20, Verizon South's territory begins at the VZ South wire center, and we don't dispute that. In fact, we don't dispute pretty much... This is relatively correct, except for one thing. What they did is they used what they call the NECA 4 tariff, which is an access tariff, a tariff, something the court said they shouldn't use, and they said... I thought they used only the percentages. But that's the tariff that gives them the ability to... They didn't use the rate. They just used the allocation. Ah, okay, but there is no allocation in the ICA. The ICA is clear. We ordered the entrance facility from Verizon. Verizon charges us all the way to the Verizon South IP. This whole area in here, where they split it, was split in a manner completely inconsistent with the ICA, only consistent with NECA 4, which is a tariff. And what they did is they said, well, we're just going to make a presumption that the Verizon South area begins, in this case, 56% into the transport here. But it doesn't. Verizon South is right here. Normally, if you're charging an access carrier, somebody's sending long-distance numbers, Verizon Wireless, for example, they're trying to figure out the connect, and there's a charge going that way, that's where you would use the NECA 4 tariff. But we ordered an entrance facility from Verizon South. We ordered it to Richmond, and we said, once you get to Richmond, split it into going some... Split the DS3, which is the 28 line, the big tube, split it into smaller tubes, some going to Verizon South, some going to Verizon. Entrance facility, we're already inside Verizon. There is no more entrance facility that we're ordering. The transportation is all Verizon, but what they did is they provided for a NECA tariff to give us a percentage of Verizon South's charges, which were per mile, which added $157.70 to this particular transaction. Overall, added $65,000 to the bill. Again, we went from $5,000 Verizon South pre-remand to $65,000 Verizon South post-remand because NECA 4 wasn't an issue pre-remand. They just decided to apply it here so they could get these per-mileage charges. And what that did is it took what should have been a number going from $10 to $3. It went from $10 to $3 to $20. So it went $10, $3, and then they said, well, we've got to get some more, so let's bring it back up to $20 by using this NECA 4 tariff, which has no application at all in the contract that we signed with them. We want to talk about, just for another moment here, the serving wire center issue. Serving wire center has nothing to do with the ICA. It's a complete tariff concept. But what they did, again, in their document here, they called the Verizon South Richmond serving wire center. You know what? This charge is correct, but it's not a serving wire center. This is their central office. They just gave it the wrong name. The reason why they gave it the wrong name is because in the tariff world, you can create these intermediate locations, which is not a central office, where switching does not occur, where it doesn't go to a tandem switch or an end-office switch. And that's what they did 500 times. They did it 500 times and added $35,000 to the bill by creating this serving wire center concept, not when there was a central office, which it is here, but even when there wasn't a central office, they created the serving wire concept, this intermediate, which in the tariff world works, but under ICA, there is nothing in the ICA that says they can do that. But by doing that, they were able to add transport twice. They were able to say, we're charging you for transport, plus we're charging for transport again. Never before at Remand did they do that. Never did they raise it with this court. But what they did is post-Remand, they came up with this theory of how to take tariff concepts, put them into the ICA, which is completely an anathema to our contract, and then create additional charges with respect to the late payment charges. You asked the question of counsel about that $250,000. That $250,000 was withheld long before the district court decision below, which originally came up on appeal. They started withholding that back in 2011. Long ago. And those charges were withheld from 2011, 2012, 2013, and they were withheld. They are complete offsets against the money that they're claiming that we didn't pay. It's not that it was a post... My question was only related to the withholding of reciprocal compensation associated as a quid pro quo for not posting a bond. That was only the piece that went forward. That wasn't the backward piece. But I'm not understanding, then, how your argument is responsive. I don't understand what you're telling me. Okay, so what I'm telling you... My question dealt... I was trying to understand, with respect to the withheld amounts that substituted for the stay, what got, under the terms of that agreement, what got applied to what. So I'm not quite sure what you're addressing. Okay, so what happened is that... Just to give you an example. They say that in 2011, we should have paid them $6,000 a month under TELWIH. Let's assume that's the number. But they were withholding from us, in 2011, $8,000 a month. Next month, $6,000, $8,000, $6,000. So they were withholding more than they say that we should have paid them under their new TELWIH calculations. When we got to trial the first time, that amount... So you're not addressing, actually, my question, are you? No, I am, because that amount equaled $250,000. What we said is that, at trial, that $250,000, they could still hold that, and any money going forward would be a hold against the $1.2 or $3 million which they said that we owed them that you reversed. So we said, keep holding the money going forward, which totaled $92,000, as of the point that we got back to the district court. And we said, keep holding that against the $1.3 million judgment that you got that you already reversed. Thank you, Mr. Tolchin. So what happened is that... If I could just finish answering the question. You're well over your time. If Judge Duncan wants to hear further from you, I'm happy to. No, thank you. I don't think we're exactly on the same page. But thank you for your effort. I would like to come down and greet counsel, and we'll move directly into our second case.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Allyson K. Duncan